IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00263-SBP

KENNETH PORTER,

     Plaintiff,

v.

TRANS STATE HOLDINGS, INC.,

     Defendant.

---

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**Susan Prose, United States Magistrate Judge**

     This is an employment discrimination case brought under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq.* The matter is before the court on Defendant's Motion for Summary Judgment (ECF No. 42) ("Motion"), filed by Defendant Trans State Holdings, Inc. ("TSH"). Plaintiff Kenneth Porter filed a response. ECF No. 48 ("Response" or "Resp.").[1] TSH filed a reply. ECF No. 56 ("Reply"). The parties consented to magistrate judge jurisdiction (ECF Nos. 14, 15), and the court considers the Motion pursuant to 28 U.S.C. § 636(c)(1). The court finds that oral argument would not materially assist in the disposition of the Motion. Upon review of the parties' briefing,

---

[1] Mr. Porter filed this 22-page response after initially submitting a 36-page response. ECF No. 46. Although he did not seek an extension of the page limits set forth in the Uniform Civil Practice Standards of the United States Magistrate Judges—and has clearly used less than double-spacing throughout—the court accepted the filing and has considered it in its entirety. *See* ECF No. 54.

the entire docket, and the applicable case law, the court respectfully **GRANTS** the Motion and

**DENIES** Mr. Porter's related Motion to Strike Sham Affidavit, ECF No. 57.

## BACKGROUND

### I.    Undisputed Material Facts

The court finds the following facts undisputed for purposes of the Motion.[2]

Mr. Porter is a U.S. Navy veteran who has worked as a pilot for United Airlines for

nearly a decade. This lawsuit focuses on his previous employment with a company called Trans

States Airlines ("TSA"), where he worked from March 26, 2001, until January 16, 2015, when

he resigned to take the position with United. *See* Motion, Statement of Undisputed Material Facts

("Undisputed Facts") ¶¶ 13, 30. Throughout the fourteen-year tenure of his employment with

TSA, Mr. Porter was a member of the U.S. Navy Reserve. Amended Complaint, ECF No. 11 at

¶ 2.2.

TSA was a privately-owned regional airline that contracted with larger airlines to provide

flight services. Undisputed Facts ¶¶ 1, 3. TSH, the named defendant here, is a privately-owned

holding company for regional airlines, including the former TSA. *Id.* ¶ 1. TSH owned TSA from

---

[2] This statement includes material facts that are properly supported by the asserting party and not opposed in the manner required by Federal Rule of Civil Procedure 56(c). In particular, the court notes that Mr. Porter did not dispute any of TSH's Statement of Undisputed Material Facts ("Undisputed Facts"). *See generally* Resp. Accordingly, the court accepts as true all material facts asserted and properly supported in the Motion. Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]"); *Beard v. Banks*, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [the plaintiff] is deemed to have admitted the validity of the facts[.]").

1998 to April 2020, when TSA ceased operations. *Id.*[3] TSA was the first regional airline to implement a "Military Rotor transition program," a program designed to "help[] service members transition to commercial jobs by providing training and pilot jobs[.]" *Id.* ¶ 11. While it was operational, TSA "won numerous awards and citations for [its] full support of employees who serve in the reserves" and, in its employee handbook under the heading "Military Leave," expressed its intention "to continue that proud tradition." *Id.* ¶ 12. In the instant litigation, Mr. Porter contends that TSA did not live up to these lofty standards in connection with his employment.

### A.    Mr. Porter's Employment History at TSA

#### 1.    Military Leave and Requests for Promotions

TSA, Mr. Porter claims, began to violate his rights under USERRA twenty years ago.

In 2004, and then again in 2011 or 2012 (Mr. Porter is uncertain about the latter date), Mr. Porter approached his union representatives to help him address "conflict[s]" with TSA employees concerning his various requests for military leave. *Id.* ¶ 16; *see also* Deposition of Ken Porter, ECF No. 42-4 at 38:10-15. Mr. Porter does not know the name of the TSA employee with whom he interacted concerning his military leave (her name might have been "Sherry"), nor does he recall the specifics of his communications with "Sherry" in 2004 and in 2011 or 2012— just "the basic conversations with her, that is about it." Porter Depo. at 43:16-17. Regardless, TSA never denied any of Mr. Porter's requests for military leave. Undisputed Fact ¶ 28. He was

---

[3] TSH itself apparently shut down in November 2021 and moved its remaining employees to GoJet Airlines, another regional airline that TSH owned at the time. Deposition of Ed Trowbridge, ECF No. 46-3 at 18:5-24. Neither party has focused on the closure of TSH, and so the court assumes that fact is of no consequence to the relief sought in the Motion.

away on deployment or other military assignments multiple times, including for a seven-month deployment from June 2003 to January 2004 and for a three-year assignment at the Pentagon from 2008 to 2011, when he was called back to active duty. *Id.* ¶¶ 15, 27; Am. Compl. ¶ 4.2.[4]

TSA promoted Mr. Porter to Captain in January 2006, Undisputed Fact ¶ 17, but there were other positions he wanted but did not get. In the spring of 2006, Mr. Porter applied to be a "Line Check Airman." *Id.* ¶ 18; Porter Depo. at 154:5-155:3, 213:13-15; Am. Compl. ¶ 4.26. "Line Check Airman" was a management-level position "responsible for ensuring safety, security, and quality in all operations, performing line checks by observing pilot proficiency during flights and ensuring compliance by flight crews of all company issued policies and procedures." Undisputed Fact ¶ 19; *see also* Declaration of Randall Zehnder, ECF No. 42-9 at ¶ 11. Mr. Porter continued to apply for Line Check Airman positions from 2006 until 2008, and he applied again on unknown dates between 2012 and 2014, but he was never selected. Porter Depo. at 213:13-24; Am. Compl. ¶ 4.37.

There were two other TSA positions Mr. Porter claims to have sought without success: Flight Manager, which was also a management-level position, and a job he calls "Safety Flight Evaluator." Am. Compl. ¶¶ 4.37, 4.42. According to Mr. Porter, he applied for the Flight Manager position sometime in 2014, *id.* ¶ 4.42, but TSH has no record of his applying to be a Flight Manager, at that time or any other. Undisputed Fact ¶ 24. As for "Safety Flight Evaluator," TSA did not have a position by that name, and there is no record of Mr. Porter

---

[4] TSA records show that Mr. Porter was on medical leave during some of his three-year stint at the Pentagon, including from June 4, 2008, to September 30, 2009. Undisputed Fact ¶ 26. For purposes of the Motion, the court need not resolve this seeming discrepancy.

applying for such a position. *Id.* ¶ 25.

As early as 2006, Mr. Porter believed that decisions concerning his requests for promotion were driven by TSA's anti-military animus. Porter Depo. at 152:21-153:7 (testifying that TSA discriminated against him based on his military status when he was "not considered or promoted for the check airman position in 2006"); Am. Compl. ¶¶ 4.26, 4.30. Mr. Porter has no direct evidence to support this proposition; he admits that no TSA or TSH official ever told him that he was not considered for a promotion because of his military leave. Undisputed Facts ¶¶ 22, 29. Instead, he relies on four pieces of circumstantial evidence: one comment by Mr. Zehnder; one sentence in TSA's 2013 Flight Operations Manual; one comment by TSH's former general counsel; and two statements in Mr. Trowbridge's deposition.[5]

<u>First</u>, Mr. Zehnder, a Flight Manager and System Chief Pilot at TSA, observed in the context of a private conversation with Mr. Porter on some unidentified date that Mr. Porter does "a lot of military duty." Declaration of Ken Porter, ECF No. 46-1 ¶ 17; Zehnder Decl. ¶ 9. However, Mr. Zehnder—who was in Mr. Porter's chain of command and who was himself a

---

[5] For purposes of evaluating the Motion, the court finds no genuine dispute concerning the existence of these statements, but whether they sufficiently evince anti-military animus so as to allow Mr. Porter to evade summary judgment is a separate question of law that the court addresses below. The court further notes that, while not required to do so, it has carefully combed Mr. Porter's briefing and the entire summary judgment record and has identified no other factual bases upon which Mr. Porter reasonably might attribute illegal discrimination under USERRA to TSA or TSH. *Cf. Espinoza v. Coca-Cola Enters., Inc.*, 167 F. App'x 743, 746 (10th Cir. 2006) (recognizing that a district court is not required to comb through the plaintiff's evidence to determine the bases for a claim that a factual dispute exists, and stating that, "where the nonmovant failed to support his case with adequate specificity, we will not fault the court for not searching the record on its own to make his case for him (nor will we take on that role of advocacy)").

military reservist when he personally was promoted to Line Check Airman and Flight

Manager—submitted sworn testimony explaining why Mr. Porter was not viewed by TSA

management as an appropriate candidate for a management-level position:

> The Line Check Airman position served as a representative of management and was responsible for ensuring safety, security and quality in all operations, performing line checks by observing pilot proficiency during flights, and ensuring compliance by flight crews of all TSA issued policies and procedures. The Flight Manager was responsible for the day-to-day supervision of pilots at TSA, including coordinating schedules and training sessions, and overseeing pilots in the performance of their jobs. As a result, when filling the Flight Manager and Line Check Airman roles, TSA management looked for candidates who portrayed strong leadership skills and served as a role-model for employees at TSA.

> Plaintiff was antagonistic and often talked negatively about the Company and management. Plaintiff also routinely complained about the Company and posed a threat to employee morale. As a result, Plaintiff did not embody the values TSA looked for in its leadership.

Zehnder Decl. ¶¶ 11-14 (paragraph breaks eliminated).

Second, Mr. Porter points to a statement in TSA's 2013 Flight Operations Manual. Under

the job description for the position of captain, the Manual adjures the captain to

> utilize the principles of Crew Resource Management and expect efficient performance of each crewmember's duties yet he will overlook small discrepancies and refrain from unnecessary and destructive criticism, so that the crewmember will maintain his self-respect and cooperative attitude. A frank discussion of minor matters of technique and performance after the flight will create goodwill and a desire to be helpful. **Sharp criticism and military[-]type orders may only result in a breakdown of morale and create an inefficient halting of performance and future duties.**

See Resp., Additional Material Disputed Fact ("Additional Facts") ¶ 3.24; ECF No. 46-4 at 2

(emphasis added); see also Resp. passim (quoting this language multiple times).

6

Third, in response to a request for feedback about Mr. Porter, David Hayes, who was then general counsel for TSA or TSH, wrote that he would object to Mr. Porter being promoted to Line Check Airman because Mr. Porter was "too much of a[n] ALPA hothead." Undisputed Fact ¶ 21 (asserting Hayes was general counsel of TSA at the time); *see also* ECF No. 42-11 (1/8/2013 email from David Hayes to Stuart Scott re: "Objection"); Deposition of Ed Trowbridge, ECF No. 46-3 at 91:24-92:1 (identifying Hayes as the former vice president and legal counsel for Trans States Holdings). "ALPA" is an acronym for the Airline Pilots Association, a civilian airline pilot union. Additional Fact ¶ 3.38.

Fourth, Mr. Porter focuses on two statements in the deposition of Mr. Trowbridge, whom TSA designated to testify pursuant to Federal Rule of Civil Procedure 30(b)(6).

The first statement was made in response to a question concerning pension "catch-up" contributions for service members, which Mr. Trowbridge answered in his individual capacity and not as a Rule 30(b) designee:

> A (by Trowbridge) So military personnel are able to make up any missed contributions when they return to active duty, and that was something that was not brought to my attention or the company's attention for – as far as I know, until late 2018 or '19.
> . . .
> Q Okay. And when it was brought to your attention, did you learn that the company failed to contribute or allow catch-up contributions from other service members as well?
>
> [Counsel for TSH]: Objection. Outside the scope. You can answer in your individual capacity, if you know.

A Okay. We – I mean, between all four companies,[6] **there were hundreds of pilots that were in the military that were constantly coming and going**. And if they notified us – if they would have notified us, then we would have made that available to them.

. . .

Q Okay. So the issue was corrected completely as to Mr. Porter?

A Yes, it was.

Trowbridge Depo. at 112:5-10, 22-113:9, 17-19 (emphasis added).

Second, Mr. Porter asserts that TSA's alleged anti-military animus is apparent in Mr. Trowbridge's response to a deposition question seeking the reasons TSH denied the following allegation in the Amended Complaint: "In 2012, Defendant promoted pilots, junior to Plaintiff, to the position of Line Check Airman or Safety Flight Evaluator." Am. Compl. ¶ 4.38 (emphasis in original); *see also* Additional Fact ¶ 3.19. Specifically, counsel for Mr. Porter asked Mr. Trowbridge:

Q What facts is TSH aware of that support this denial?

[Counsel for TSH]: Objection. Outside the scope. Ed, if you know the answer, you can answer in your individual capacity. But if you don't know, that's okay.

A Yeah. I – I don't know who they would have hired. That's not something that we would have been privy to at Trans States Holdings.

Trowbridge Depo. at 60:22-61:6.

### 2.    Resignation and Post-TSA Contact with Attorneys

When Mr. Porter resigned from TSA on January 16, 2015, he informed TSA officials that

---

[6] It is apparent from Mr. Trowbridge's deposition that his statement regarding "all four companies" refers to TSA, TSH, GoJet, and another regional carrier called Compass Airlines. Trowbridge Depo. at 101:13-22.

he "would like to remain in good standing with Trans States Airlines and the leadership team." Undisputed Fact ¶ 30; ECF No. 42-14 (1/16/2015 email re: Resignation – CA Ken Porter, 15166). In his deposition, Mr. Porter explained that his resignation from TSA was motivated by a desire to work for United Airlines:

> Q Just to be clear, did you resign from Trans States Airlines because of the perceived discrimination/retaliation on the basis of your military status and military leave?
> . . .
> A So **I resigned from Trans States Airlines because I wanted to go to a major legacy airline like United Airlines for my last-stop career growth. I didn't want to move to any other airlines. If I had not been hired by United Airlines, I would have continued to work at Trans States**.

Undisputed Fact ¶ 31; Porter Depo. at 193:9-12, 20-25 (emphasis added). And if his employment with United had not worked out, Mr. Porter "was hoping to come back to Trans States Airlines." Undisputed Fact ¶ 30; Porter Depo. at 190:7-15.

Sometime in 2017—two years after he took the position with United—Mr. Porter hired an attorney named Peter Romer-Friedman to assist him with obtaining a "401(k) match" for lost wages and benefits he believed had been denied to him during his employment with TSA. Undisputed Facts ¶¶ 32, 33; Porter Depo. at 234:5-235:12. At least a year after that, on October 15, 2018, TSA received a demand letter from Mr. Romer-Friedman, asserting that TSA had violated USERRA by failing to promote Mr. Porter and to make contributions to his retirement plan during periods when he was on active military duty. Undisputed Fact ¶ 33; Trowbridge Decl., ECF No. 42-2 ¶ 14. The TSA retirement plan was a contributory plan, which required the employee to make a contribution in order to receive a match from TSA. Supplemental Trowbridge Decl., ECF No. 56-1 ¶ 3.

On March 22, 2019, after investigating Mr. Porter's claim for benefits, TSA contributed $1,340.43 to Mr. Porter's 401(k) retirement plan "to make up for the missed contributions during [his] periods of military leave and [he] received a W-2 in connection with the same." Undisputed Fact ¶ 34. The transaction history for Mr. Porter's 401(k) plan reflects that a payment of $1,340.43, along with an additional payment of $1,170.83,[7] were made on March 22, 2019. ECF No. 42-15 at 1. That total payment of $2,511.26 is a little over four hundred dollars less than the amount Mr. Porter's retained expert in this matter has calculated was owed to Mr. Porter. Additional Fact ¶ 3.2; *see also* Report of Stan Smith, Ph.D., ECF No. 46-5 at 6 (stating the "opinion of the loss of employer 401(k) match from TSA while on military duty from 2008

---

[7] In Mr. Trowbridge's supplemental declaration submitted with TSH's Reply, Mr. Trowbridge stated that the $1,170.83 payment—which had not been specifically discussed in Mr. Trowbridge's original declaration—represented the additional investment earnings Mr. Porter would have received with the $1,170.83 included in his 401(k) plan. Reply at 9; ECF No. 56-1 ¶ 5. This statement has prompted an accusation by Mr. Porter that Mr. Trowbridge's supplemental declaration is a "sham." *See* Motion to Strike, ECF No. 57 at 3-6. The court respectfully disagrees with this characterization and expressly finds no contradiction between Mr. Trowbridge's earlier declaration and his supplemental explanation of the $1,170.83 payment. *See* ECF No. 42-15 at 1-2 (reflecting payments of $1,170.83 and $1,340.43 to Mr. Porter's 401(k) account on March 22, 2019); *see also Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1169-70 (10th Cir. 2009) (in deciding the "sham fact issue" question, the Tenth Circuit Court of Appeals specifically "require[s] that the district court first determine whether the conflicting affidavit is simply an attempt to create a 'sham fact issue' before excluding it from summary judgment consideration") (cleaned up).

Neither does the court discern any inconsistency between Mr. Trowbridge's statement in his supplemental declaration and his deposition testimony as TSH's designee pursuant to Rule 30(b)(6). This court has carefully reviewed the deposition transcript and has located no testimony—and Mr. Porter points to none—in which Mr. Trowbridge was asked to delineate the specific amounts issued by TSH as "catch up" contributions, and so his supplemental declaration does not "directly contradict" any "lack of knowledge at deposition." *See* Motion to Strike at 3; *see also* ECF No. 46-3 at 63, 65, 111-115 (reflecting all substantive testimony concerning the 401(k) plan). The court therefore declines to strike Mr. Trowbridge's supplemental declaration.

through 2011 is $2,941").[8]

In 2022, three years after TSH made the additional payments to Mr. Porter's 401(k) retirement account, Mr. Porter retained new counsel: Thomas Jarrard and Robert Mitchell, his attorneys here. Undisputed Fact ¶ 35. Mr. Porter was obliged to obtain new counsel because Mr. Romer-Friedman "did not want to take on the case." Porter Depo. at 236:18-25. After Mr. Romer-Friedman's departure, it took four years—measured from the October 2018 Romer-Friedman letter—for Mr. Porter to locate new counsel because, as he puts it, "[i]t takes a lot of time to find the right and correct counsel." *Id.* at 237:8-16.

---

[8] The court is unpersuaded by TSH's argument that Mr. Smith's declaration is not proper summary judgment evidence because "an expert report may not introduce facts and is therefore generally inadmissible at the summary judgment stage." Reply at 11 (citing precedent outside the Tenth Circuit and this District). As judges in this District have recognized, "Federal Rule of Civil Procedure 56 underwent significant amendments in 2010. As the Court has described elsewhere, it is not clear if declarations or affidavits are needed *at all* under the revised rule, given its emphasis on whether an assertion may be supported by evidence admissible at trial, not on the form of the assertion in the summary judgment record." *Terranova v. Safeco Ins. Co. of Am.*, No. 21-cv-03286-NYW-SBP, 2024 WL 4068759, at *5–6 (D. Colo. Sept. 5, 2024) (citing *Lyall v. City of Denver*, No. 16-cv-2155-WJM-CBS, 2018 WL 1470197, at *4-6 (D. Colo. Mar. 26, 2018) (emphasis in original)). Further, judges in this District have "repeatedly faced and routinely rejected this argument in the context of unsworn expert reports submitted as evidence of what an expert would say at trial." *Id.* (quoting *Lyall*, 2018 WL 1470197, at *5) (cleaned up, citations omitted). *See also Silverman v. Greenfield*, No. 16-cv-00110-WJM-NRN, 2019 WL 409340, at *11 (D. Colo. Jan. 31, 2019). As the court in *Lyall* emphasized in rejecting the "utterly formalistic" objection to an unsworn expert report as summary judgment evidence, "the procedure surrounding expert reports provides safeguards and indicia of reliability similar to those provided by sworn affidavits or declarations." *Id.*

Recognizing that the facts relied on by Mr. Smith can "be presented in a form that would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2), this court can consider his opinions in assessing whether a genuine dispute of material fact precludes summary judgment. Regardless, as explained in the court's analysis below, no genuine dispute prevents summary judgment from entering in favor of TSH.

## II.      Procedural History of the Instant Litigation

On January 30, 2023, Mr. Porter initiated this action in which he brings two claims under USERRA. In Claim One, he maintains that the conduct by TSA delineated above reflects illegal discrimination and retaliation based on his military status. Am. Compl. ¶¶ 5.1-5.17. In Claim Two, he separately contends that TSA's anti-military animus prompted it to avoid making contributions to his 401(k) retirement plan. *Id.* ¶¶ 6.1-6.7 (Claim 2). As relief, he seeks damages in the form of lost wages and benefits, as well as injunctive and declaratory relief compelling TSH to comply with the law by adhering to the requirements of USERRA. *Id.*, Prayer for Relief, at 13-14.

TSH seeks summary judgment in its favor on both claims. For the reasons that follow, the court grants the Motion for Summary Judgment.

## LEGAL STANDARD

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013). But "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original)). Put another way, "[t]o survive a motion for summary judgment, the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *N.M.*

*Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171-72 (10th Cir. 2021) (cleaned up) (quoting *Anderson*, 477 U.S. at 252). A fact is "material" if it pertains to an element of a claim or defense. *Anderson,* 477 U.S. at 248. Whether there is a "genuine issue" as to a material fact depends on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *accord SEC v. GenAudio Inc.*, 32 F.4th 902, 920 (10th Cir. 2022).

"[O]nce the movant has made a showing that there is no genuine dispute of material fact, the non-moving party must 'make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "For dispositive issues on which the [nonmovant] will bear the burden of proof at trial, [the nonmovant] must 'go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment.'" *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (cleaned up) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)); *see also May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) ("Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial.") (quotation omitted).

The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (quoting *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th

Cir. 2005)). "To defeat a motion for summary judgment, [the nonmovant's] evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Id.* (quoting *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)); *accord Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003) ("Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment.") (quotation omitted). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## ANALYSIS

TSH argues that it is entitled to summary judgment for four reasons. First, it asserts that Mr. Porter's claims are barred by the doctrine of laches. Motion at 7-11. Second, TSH argues that judgment should be entered in its favor because TSH was never Mr. Porter's employer—rather, he was employed by the now-defunct TSA—and TSH is not a successor-in-interest to TSA. *Id.* at 11-14. Third, TSH contends, Mr. Porter cannot make out a prima facie case of discrimination or retaliation under USERRA. *Id.* at 14-19. Finally, TSH argues that Claim Two, the claim about Mr. Porter's pension, is moot because TSA corrected any error by making catch-up contributions in March 2019. *Id.* at 19-20.

The court first addresses the threshold issue of whether TSH was Mr. Porter's employer for purposes of imposing liability against that entity under USERRA. On this point, the court

finds that the record includes sufficient evidence for a reasonable jury to find in Mr. Porter's favor. Regardless, TSH is entitled to summary judgment. On the record before the court, Mr. Porter fails to show a material fact dispute to support his claim that TSH violated USERRA. there is no genuine dispute that the material facts fail to show that TSH engaged in any conduct proscribed by USERRA.

## I.    TSH as Mr. Porter's "Employer" Under USERRA

Genuine issues of material fact prevent the court from concluding, as a matter of law, that TSH could not have been Mr. Porter's employer for purposes of his USERRA claims.

In assessing the question, the court begins with USERRA's broad definition of "employer," which includes "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities." 38 U.S.C. § 4303(4)(A). The term "employer" encompasses persons or entities "to whom the employer has delegated the performance of employment-related responsibilities," except where the delegated functions "are purely ministerial in nature, such as maintenance of personnel files or the preparation of forms for submission to a government agency." *Id.*; 20 C.F.R. § 1002.5(d)(1)(i). Consistent with this comprehensive definition, the legislative history of USERRA exhibits Congress's intention that the term employer "be broadly construed," and that it include more than the "'traditional' single employer relationship"—including entities who "may exercise control over different aspects of the employment relationship." H.R. No. 103-65(I), 103d Cong., 1st Sess., 21 (1993) (the "1993 House Report") (citation omitted), as reprinted in 1994 U.S.C.C.A.N. 2449, 2454, available at 1993 WL 235763 (Leg. Hist.).

Thus, USERRA encompasses the idea of a "joint employment relationship" between two

entities, pursuant to which an employee working in one job can have more than one employer:

> Under USERRA, an employer includes not only the person or entity that pays an employee's salary or wages, but also includes a person or entity that has control over his or her employment opportunities, including a person or entity to whom an employer has delegated the performance of employment-related responsibilities. For example, if the employee is a security guard hired by a security company and he or she is assigned to a work site, the employee may report both to the security company and to the site owner. In such an instance, both employers share responsibility for compliance with USERRA. If the security company declines to assign the employee to a job because of a uniformed service obligation (for example, National Guard duties), then the security company could be in violation of the reemployment requirements and the anti-discrimination provisions of USERRA. Similarly, if the employer at the work site causes the employee's removal from the job position because of his or her uniformed service obligations, then the work site employer could be in violation of the reemployment requirements and the anti-discrimination provisions of USERRA.

20 C.F.R. § 1002.37; *see also* 1993 House Report, *as reprinted in* 1994 U.S.C.C.A.N. 2449, 2454; S. Rep. No. 103-158, at 42 (1993), *available at* 1993 WL 432576 (Leg. Hist.).

In situations where there is a joint employment relationship, the USERRA regulations do not allocate liability between "primary" and "secondary" employers. *See* 70 Fed. Reg. 75246, 75252 (Dec. 19, 2005), *available at* 2005 WL 3451171 (F.R.) (declining to adopt a distinction between primary and secondary employers in final USERRA rules). The definition of "employer" under USERRA also includes a "successor in interest" to a plaintiff's previous employer. 38 U.S.C. § 4303(4)(A)(iv). In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former

employer.[9]

The parties debate whether TSH might fall within the parameters of a successor in interest to TSA, *see* Motion at 13-14, Resp. at 21-22, Reply at 14, but they do not attempt to engage with the equally pertinent question of whether TSA and TSH functioned as joint employers of Mr. Porter. On that score, the court finds that Mr. Porter has presented evidence from which a reasonable jury could find that TSH was one of his "employers."

TSH, TSA, and GoJet Airlines, another regional airline owned by TSH, shared the same corporate headquarters and had offices in the same building. Additional Facts ¶¶ 3.58, 3.64. Richard Leach was the president and chief executive officer of both TSA and TSH. *Id.* ¶ 3.76; *see also* Leach Decl., ECF No. 56-3 ¶¶ 1-2. With regard to Mr. Porter specifically, TSH verified employment for him and other TSA employees, processed his TSA paychecks, and—as with all TSA employees—would have processed any claim he might have made for unemployment, disability, and requests under the Family Medical Leave Act, 29 U.S.C. § 2615 ("FMLA"). *Id.* ¶ 3.65. Further, it is apparent from the record that, while disclaiming that it was Mr. Porter's

---

[9] The determination of whether an employer is a successor in interest is made on a case-by-case basis and requires consideration of factors specifically-enumerated in a Department of Labor regulation:

> (a) Whether there has been a substantial continuity of business operations from the former to the current employer;
> (b) Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production;
> (c) Whether there has been a substantial continuity of employees;
> (d) Whether there is a similarity of jobs and working conditions;
> (e) Whether there is a similarity of supervisors or managers; and,
> (f) Whether there is a similarity of products or services.

20 C.F.R. § 1002.35.

employer, TSH maintains some information (if incomplete) concerning Mr. Porter's employment history. Most especially, the current record is unclear whether it was the general counsel for *TSH* or for TSA (or both) who weighed in on Mr. Porter's suitability to be promoted to the position of Line Check Airman at *TSA. Compare* Undisputed Fact ¶ 21 with Trowbridge Depo. at 91:24-92:1. Mr. Trowbridge's Rule 30(b)(6) testimony indicates that it was general counsel of TSH who gave input over employment decisions for persons officially employed by TSA. Trowbridge Depo. at 91:24-92:1; *see also, e.g.*, *O'Connell v. Town of Bedford*, No. 21 Civ. 170 (NSR), 2022 WL 4134466, at *7 (S.D.N.Y. Sept. 12, 2022) (recognizing that "courts directly considering the issue have held that individuals who have authority *or input* over hiring and firing or promotion are 'employers' under USERRA") (citations omitted); *Carter v. Siemens Bus. Servs., LLC*, No. 10 C 1000, 2010 WL 3522949, at *9 (N.D. Ill. Sept. 2, 2010) (official who "makes recommendations to managers regarding discipline and termination" and "influenced the company's decision to terminate [the plaintiff's] employment").

TSH argues that it was not Mr. Porter's employer because it did not have control over his employment opportunities and denies that it had authority to promote him. Motion at 11-12. That ultimately might be shown to be the case, but given the conflicting evidence of whether Mr. Hayes was counsel for TSA or TSH (or both), a reasonable jury could find that the email seeking Mr. Hayes's input on the promotion question indicates otherwise. Too, while the presence of a common CEO for TSA and TSH "alone does not create liability," that fact suggests some measure of control for purposes of § 4303(4)(A). *See White v. United Airlines, Inc.*, 987 F.3d 616, 627 (7th Cir. 2021). TSH may have other evidence more persuasively showing that it cannot be considered Mr. Porter's employer, but the evidence in the summary judgment record—

construed, as the court must, in Mr. Porter's favor—does not permit a conclusive finding that TSH was *not* his employer.

Another court has reached a similar conclusion in a case in which TSH attempted to distinguish itself from both TSA and GoJet for purposes of the definition of "employer" under FMLA. *See Cuff v. Trans States Holdings, Inc.*, 816 F. Supp. 2d 556 (N.D. Ill. 2011). In finding that "GoJet, TSH, and TSA were joint employers" of the plaintiff, and entering summary judgment in favor of the plaintiff on the "employer" question, the court took into account undisputed material facts showing that, while the companies had separate lower-level managers, they shared the same upper-level management; Mr. Leach is the President of all three companies; Mr. Trowbridge, who was then the Managing Director of Customer and Ground Services for TSH, directly supervised employees of all three entities; the companies shared customer service administrators and marketing support staff; TSH maintained personnel files for TSA and GoJet; and the companies filed a joint tax return. *Id.* at 562 (cleaned up; internal quotation marks omitted); *see also Cuff*, 768 F.3d 605, 608, 610 (7th Cir. 2014) (affirming trial court's decision that "Cuff was a joint employee of at least Trans States and GoJet, if not of Holdings too," and finding that the trial court did not abuse its discretion in awarding the plaintiff $325,000 in attorney's fees after he prevailed at trial).

This court recognizes, of course, that the evidence in the summary judgment record in *Cuff* is not precisely identical to that in the record here and that this court must look to its own record. But the evidence in *Cuff* does serve to emphasize what is likewise apparent on the record here: the existence of an intertwined operational interrelationship between TSH and TSA that prevents this court from concluding, as a matter of law, that Mr. Porter could not have been a

19

joint employee of TSH while he was officially on TSA's payroll. Analyzed pursuant to the

USERRA standards, the evidence in the record here shows that TSH had "control over" at least

some of Mr. Porter's "employment opportunities" and had "employment-related responsibilities"

with regard to TSA and its employees (including Mr. Porter) that were not "purely ministerial in

nature." 20 C.F.R. § 1002.5(d)(1)(i); *see also* 38 U.S.C. § 4303(4)(A)(i).

At a minimum, there is a genuine dispute about the matter. Therefore, for purposes of its

analysis of the Motion and the pending USERRA claims, the court understands TSH to have

employed Mr. Porter jointly with TSA.[10] Regardless, for the reasons that follow, summary

judgment should still be granted in TSH's favor.

## II.    Discrimination and Retaliation Based on Non-Selection for Promotions (Claim One)

USERRA was enacted to protect the rights of veterans and members of the uniformed

services. *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 311-12 (4th Cir. 2001). USERRA prohibits

employers and prospective employers from discriminating and retaliating against service

members based on their military service or their assertion of entitlement to rights under the

statute. 38 U.S.C. §§ 4311(a), (b).

USERRA provides that a member of the military shall not be denied a promotion or any

benefit of employment by an employer "on the basis of that membership, application for

membership, performance of service, application for service, or obligation." *Id.* § 4311(a). An

employer violates § 4311(a) when an employee's membership or performance of service is a

"motivating factor in the employer's action, unless the employer can prove that the action would

---

[10] In the analysis that follows, and for purposes of summary judgment only, a reference to one entity is equally applicable to the other.

have been taken in the absence of such membership[.]" *Id.* § 4311(c)(1).

USERRA further prohibits retaliation against military personnel:

An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter.

*Id.* § 4311(b). "Although section 4311(b) does not use the term 'retaliation,' the gravamen of the subsection is to prohibit adverse action taken in retaliation for involvement in the assertion of the substantive rights established by USERRA." *Quick v. Frontier Airlines, Inc.*, 544 F. Supp. 2d 1197, 1208 (D. Colo. 2008) (citing *Wallace v. City of San Diego,* 479 F.3d 616, 625 n.1 (9th Cir. 2007)). As with militarily-motivated discrimination, an employer violates § 4311(b) when an employee's action to enforce a protection under, or a right conferred by, USERRA, "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action . . . or exercise of a right." *Id.* § 4311(c)(2).

If the employee is within the class of persons protected by §§ 4311(a) and (b), the court must evaluate the case under a burden-shifting scheme. The employee bringing a USERRA claim "'bear[s] the initial burden of showing by a preponderance of the evidence that [his or her] military service was a substantial or motivating factor in the adverse employment action." *Lewis v. Rite of Passage, Inc.*, 217 F. App'x 785, 786 (10th Cir. 2007) (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that

consideration." *Id.* (quoting *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005)). "A court may infer discriminatory motivation under USERRA from a variety of indicators, including: (1) proximity in time between the employee's military activity and the adverse employment action; (2) inconsistencies between the proffered reason and other actions of the employer; (3) an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity; and (4) disparate treatment of certain employees compared to other employees with similar work records or offenses." *Lewis*, 2006 WL 650192, at *6, *aff'd*, 217 F. App'x 785 (10th Cir. 2007) (citing *Coffman*, 411 F.3d at 1238; *Sheehan*, 240 F.3d at 1014)).

"If the employee meets his initial burden, 'the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Lewis*, 217 F. App'x at 786 (quoting *Sheehan*, 240 F.3d at 1014). "In the summary judgment context, the employee must establish a genuine issue of material fact as to whether his military status was a motivating factor in the adverse employment action to survive summary judgment." *Id.* at 787 (citing *Hill*, 252 F.3d at 313). "To prevail on summary judgment, the employer must then establish not just that it had a legitimate basis for taking the adverse employment action, but as a matter of uncontroverted fact that it would have taken the adverse employment action regardless of the employee's military status." *Id.* (citing *Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002)).

### A.   No Competent Summary Judgment Evidence of Discrimination/Retaliation

TSH argues that Mr. Porter has failed to present evidence sufficient to allow him to meet his initial burden under USERRA to show, by a preponderance of the evidence, that his military

service was a substantial or motivating factor in the decisions regarding his non-selections for promotion. *See* Motion at 15-18; Reply at 7-10; *see also EchoStar Satellite LLC v. Persian Broad. Co.*, No. 05-cv-00466-PSF-MEH, 2007 WL 1970321, at *7 (D. Colo. July 3, 2007) ("[E]ntry of summary judgment against a party is appropriate if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish evidence of an element essential to that party's case and on which that party will bear the burden of proof at trial.") (citing *Celotex*, 477 U.S. at 322); *Ultegra Fin. Partners, Inc. v. Marzolf*, No. 19-cv-00038-MSK-MEH, 2020 WL 956432, at *4, 6 (D. Colo. Feb. 27, 2020) (recognizing that Federal Rule of Civil Procedure 56(c)(1)(B) permits the movant to establish that a fact is non-disputed by pointing to the opposing party's lack of admissible contrary evidence).

The record supports TSH's assessment. Mr. Porter's evidence reduces to his own conclusory statements, which hinge on the logically-flawed premise that the mere fact of his being a military member means that TSH's decisions about his employment were perforce made on that basis. Without more—and the court respectfully finds that there is no more—Mr. Porter's conclusory assertions, devoid of factual support, are insufficient to defeat summary judgment. Fatally, Mr. Porter fails to bolster his speculative contentions with competent summary judgment evidence that would allow a reasonable jury to find that any of TSH's decisions about his non-promotions, which date back to the spring of 2006, Undisputed Fact ¶ 18, were motivated by his military status.

Following his promotion to captain in January 2006, Mr. Porter worked at TSH nine more years and was not promoted again. Porter Decl. ¶ 12; Undisputed Fact ¶ 17. To be sure, Mr. Porter "has always *affirmatively alleged*" that he was not promoted to Line Check Airman and

"*believed* it was because of his military status." Additional Fact ¶ 3.18 (cleaned up, emphasis added). Likewise has he "*always alleged*" that pilots "junior to" him were promoted to that position. *Id.* ¶ 3.19 (emphasis added). But allegations about what Mr. Porter believes are not competent summary judgment evidence. As the Tenth Circuit Court of Appeals has emphasized, "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings [; they] must be based on more than mere speculation, conjecture, or surmise." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (quoting *Bones*, 366 F.3d at 875 (citation omitted)). Importantly, "[i]nformation presented in the nonmovant's affidavit must be 'based on personal knowledge and *[must set] forth facts* that would be admissible in evidence. We do not consider conclusory and self-serving affidavits.'" *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) (citation omitted, emphasis added) (quoting *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (cleaned up)). Thus, Mr. Porter's suppositions and subjective beliefs about TSH's motivations do not create a genuine issue of material fact. *See, e.g.*, *Bones*, 366 F.3d at 876 ("Testimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment.").

Speculative and self-serving statements aside, Mr. Porter argues that summary judgment must be denied because a handful of statements by TSA or TSH officials sufficiently demonstrate anti-military animus for a reasonable jury to find in his favor. The court analyzes each statement, in turn, and finds that these stray remarks—whether considered individually or collectively—do not support a genuine dispute of fact on this element of Mr. Porter's claim.

**Mr. Zehnder's comment.** First, Mr. Zehnder, a former TSA employee in Mr. Porter's chain of command, stated at some unspecified time that Mr. Porter does "a lot of military duty."

24

Porter Decl. ¶ 17. No inference of military hostility may inferred from this solitary remark, which was made by an official who was himself a military reservist who deployed for Operations Desert Shield, Desert Storm, and Iraqi Freedom during his employment with TSA. Zehnder Decl. ¶¶ 2-3, 5, 7. Notwithstanding his own lengthy deployments, Mr. Zehnder received several promotions when he returned to work at TSA: the first in 1993, when he was promoted to Flight Manager after his 1990 deployment for Operations Desert Shield and Desert Storm, and the second in 2005, when he was promoted to System Chief Pilot after a fifteen-month deployment in support of Operation Iraqi Freedom. *Id.* ¶¶ 5-7; *see also* Porter Decl. ¶ 15 (acknowledging that "Randy Zehnder was also active in the military").

Considered in this context, Mr. Zehnder's isolated remark is insufficient to show that Mr. Porter's military status was a motivating factor in his non-selection for promotions. As the Tenth Circuit has made clear, even more overtly hostile statements than Mr. Zehnder's observation do not unambiguously express the anti-military sentiment required to stave off summary judgment on a USERRA discrimination claim:

> Starr claims certain comments by his supervisor show that anti-military animus played a part in QuikTrip's decision to fire him. Specifically, Starr testified that when he returned to QuikTrip after his tour in Afghanistan, his supervisor (who, like Starr, is a former Marine) asked Starr whether he had "got all of his killing done," and told him "you ought to just go back into the military since you like it so much."

> It's true that a discriminatory motive "may be reasonably inferred from," among other things, "an employer's expressed hostility towards service-members." *Sheehan*, 240 F.3d at 1013. **But while Starr's supervisor's comments may be insensitive, they do not unambiguously express an anti-military sentiment— especially in this context, where the supervisor is a former service-member himself**.

*Starr v. QuikTrip Corp.*, 655 F. App'x 642, 646 (10th Cir. 2016) (affirming summary judgment in favor of employer on a discriminatory termination claim under USERRA) (cleaned up, emphasis added)).

Even less indicative of anti-military animus than the supervisor's statement in *Starr* is Mr. Zehnder's observation about the quantity of Mr. Porter's military duty, made in the context of a personal conversation between the two men. Porter Decl. ¶¶ 16-17. Neither is there any evidence suggesting that Mr. Zehnder personally played a role in any promotion decision, supervised any of the employees who made the promotion choices, or otherwise acted with a discriminatory purpose against a military service member who, like himself, had a history of multiple deployments in support of the war on terror. *See Starr*, 655 F. App'x at 646 ("[W]hile Starr's supervisor's comments may be insensitive, they do not unambiguously express an anti-military sentiment—*especially in this context, where the supervisor is a former service-member himself.*") (emphasis added); *see also, e.g.*, *Stover v. Martinez*, 382 F.3d 1064, 1077 (10th Cir. 2004) ("Isolated remarks, unrelated to the disputed employment action, are insufficient to demonstrate discriminatory animus" for Title VII claims); *Sims v. KCA, Inc.*, 28 F.3d 113, 1994 WL 266744, at *4 (10th Cir. 1994) (unpublished table decision) ("This court has held that absent a demonstrated nexus between discriminatory remarks and the challenged personnel decision, such remarks are only 'stray,' isolated remarks which are insufficient to establish discriminatory animus.") (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994)).[11]

No rational trier of fact could conclude from Mr. Zehnder's comment that anti-military

---

[11] The Supreme Court has recognized that USERRA "is very similar to Title VII." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011).

animus prompted TSA's decisions to select other applicants for promotion over Mr. Porter. Accordingly, the court finds that, by means of Mr. Zehnder's comment, Mr. Porter has not raised a genuine issue of fact to support his claim that TSH had an anti-military animus when it decided not to promote him.

**Statement in TSA's 2013 Flight Operations Manual.** Neither does a genuine issue of fact concerning supposed anti-military sentiment arise from the statement in TSA's Flight Operations Manual directing captains to avoid "[s]harp criticism and military-type orders" in their interactions with subordinate crewmembers. Additional Fact ¶ 3.24; ECF No. 46-4 at 2. That statement cannot rationally be construed to suggest that TSA was motivated by animus against service members by instructing its captains—so many of whom were current or former service members—that a military style of leadership may not be effective in managing civilian employees engaged in the business of operating commercial flights for United Airlines. Additional Fact ¶ 3.24; *see also Cuff*, 768 F.3d at 607 (noting that United Airlines contracted with TSH for regional air services under the United Express brand).

The observation that too militaristic an approach in a civilian setting could result in a "breakdown of morale" and "create an inefficient halting of performance and future duties" by crewmembers (including crewmembers who had never served in the military), *see id.*, cannot rationally be construed as suggesting that "Trans States Airlines held animus against servicemembers." Porter Decl. ¶ 21. *Cf. Hanson v. Cnty. of Kitsap*, 21 F. Supp. 3d 1124, 1134, 1145 (W.D. Wash. 2014) (concerns of job interviewers that the plaintiff's self-described leadership style of creating a "common enemy" would not fit the job, and interviewer's note that the plaintiff "seems very military centric," were "not instances of discrimination or anti-military

animus"). Mr. Porter presents no evidence whatsoever to support his conclusory proclamation that the verbiage in the Manual "proves" TSA's discriminatory animus against his military status, and on this record, no reasonable juror could believe that. *Scott*, 550 U.S. at 380.

***Deposition statements by Mr. Trowbridge.*** Equally conclusory and lacking in factual underpinning are Mr. Porter's allegations concerning two statements made by Mr. Trowbridge in his deposition. Mr. Porter urges that a discriminatory motive may be inferred from Mr. Trowbridge's testimony that military pilots were "constantly coming and going" at TSA, and that he personally did not know which TSA employees were promoted instead of Mr. Porter. Additional Facts ¶¶ 3.17, 3.32, 3.33.

Even affording these allegations the maximum possible credit, it is impossible to extract from Mr. Trowbridge's statements any coherent justification for inferring that TSA or TSH harbored discriminatory intent against military personnel in general or Mr. Porter in particular. Logically, the fact of military pilots "constantly coming and going" would at least equally evince TSA's *pro-military* animus, in that it shows the company employed a large number of military personnel and dealt with the fact that their military commitments resulted in fluctuating schedules. Nor does anything in the larger context in which Mr. Trowbridge's testimony arose permit an inference of anti-military animus by TSA or TSH. Trowbridge Depo. at 112:5-10, 22-113:9, 17-19 (Trowbridge explaining that TSH addressed pilots' requests for "catch-up contributions" to their retirement plans and "made that available to them").

It is also impossible to infer any improper discriminatory animus on the part of TSH from Mr. Trowbridge's lack of personal knowledge about the identity of specific employees who received promotions instead of Mr. Porter a decade and more after the fact—recall that Mr.

Porter now claims to have sought promotions beginning in 2006, Porter Depo. at 152:21-153:7—particularly where *Mr. Porter himself* has notably failed to place in the record any factual specifics explaining who the selectees were (including, critically, whether they were military personnel); in what manner they were "junior" to him, and by how much; and why (in his view, at least) he was better qualified than each of them for a specific role. Moreover, Mr. Porter does not contest TSH's representation that Mr. Trowbridge was not designated to testify on the topic of Mr. Porter's promotions, *see* ECF No. 46-3 at 60:22-61:6, nor does he point to evidence showing that Mr. Trowbridge was involved in any decision to select another candidate for promotion over him.

In sum, no evidence allows the court to find that Mr. Trowbridge's statements exhibit military hostility by TSH, and Mr. Porter has failed to raise a genuine dispute on that basis.

**Mr. Hayes's "ALPA hothead" statement.** Finally, and least compelling of all of the proffered statements purporting to demonstrate TSH's anti-military animus, is the remark by TSA/TSH's then-general counsel that he viewed Mr. Porter as an "ALPA hothead." Undisputed Fact ¶ 21.

As an initial matter, it is an important, if obvious, point that the Airline Pilots Association is a labor organization that does not limit its membership to persons who serve or have served in the armed forces. *See, e.g.*, *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 123 (2d Cir. 1998) (describing ALPA as "the certified collective bargaining representative for pilots employed by all the major airlines operating in the United States"). Therefore, this court can ascribe no prejudice against persons who perform military service to TSH (or TSA) on the basis of Mr. Hayes's statement. Nor does this solitary remark support Mr. Porter's assertion that

"Trans States Airlines used my union activities as a pretext for Trans States Airlines' intentional discrimination, retaliation, and refusal to promote me because I missed work to perform military service." Porter Decl. ¶ 22; *see also* Additional Fact ¶ 3.39. Put simply, there is no logical connection between Mr. Porter's premise that he was perceived by one TSA/TSH official as an "ALPA hothead" and his conclusion that his "union activities" were a pretext for the *real* source of TSH's animosity, i.e., his military leave. *See, e.g.*, *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005) ("Unsupported conclusory allegations . . . do not create an issue of fact."). Respectfully, this non sequitur does not establish the existence of a material fact dispute.

Mr. Porter has failed to meet his burden to produce competent evidence showing a material fact dispute to support his claim that personnel at TSA or TSH "relied on, took into account, considered, or conditioned its decision[s]" to select other persons for promotion based on his military status, including his utilization of military leave—which, as he acknowledges, TSA never denied. *See Lewis*, 217 F. App'x at 786. Further, as relevant to the retaliation component of Mr. Porter's claim, the court notes the lack of any evidence establishing temporal proximity between his return from any military leave and his non-selection for a specific promotion. *Cf. Lewis*, 2006 WL 650192 at *8 (noting "a close proximity" between the plaintiff's attendance at a military drill weekend and his termination the very day he returned from drill, but granting summary judgment in favor of the employer where "beyond temporal proximity," the plaintiff offered "only flawed logic and vague speculation to establish a connection between his military service and Defendant's termination of his employment"). Like the plaintiff in *Lewis*, Mr. Porter mounts a *post hoc ergo prompter hoc* argument based on the fact that he was not

promoted after he took military leave, but with no evidence—even evidence of temporal proximity—supporting a causal connection between the leave and the non-promotion. As in *Lewis*, Mr. Porter's argument "is unconvincing and insufficient to satisfy his burden to demonstrate that his military duties influenced Defendant's employment decision." *Id.* (citations omitted).

Additionally, this court would be remiss in not remarking on the extensive evidence in the summary judgment record which further emphasizes the absence of any material fact dispute. That evidence shows TSA's actions were marked by a decidedly *pro-military* stance. Its "Military Rotor Program" aimed at assisting military pilots in transitioning to employment in the commercial airline industry, and TSA won awards for its support of service members. Undisputed Fact ¶ 12. Not only is there no dispute about these points, the record further establishes that Mr. Porter relayed positive feelings toward TSA when he voluntarily left its employ to work for a "legacy airline" as the capstone of his career. Undisputed Fact ¶ 30; Porter Depo. at 193:20-25. Even at the time of his departure, Mr. Porter wanted "to remain in good standing with Trans Sate Airlines and the leadership team," Undisputed Fact ¶ 30, ECF No. 42-14, and had he "not been hired by United Airlines, [he] would have continued to work at Trans State." *Id.*

In light of the foregoing undisputed facts, the smattering of disconnected, purportedly anti-military remarks compiled by Mr. Porter—and his wholly speculative attempts to tie them together—do not establish a genuine issue of fact as to TSH's discriminatory motives with respect to his non-selection for promotions. *See, e.g.*, *Lewis*, 2006 WL 650192, at *7 (finding, in granting summary judgment to employer, that "Plaintiff's wildly speculative argument is wholly

unconvincing to establish Defendant's discriminatory motive"); *Wagoner v. Pfizer, Inc.*, 391 F. App'x 701, 708 (10th Cir. 2010) ("[E]ven at the summary judgment stage, 'stray remarks,' and 'isolated or ambiguous comments are too abstract . . . to support a finding of age discrimination.'") (cleaned up; quoting *Cone*, 14 F.3d at 531; *Starr*, 655 F. App'x at 646) (declining to find, at the summary judgment stage, an unambiguous expression of anti-military sentiment from a direct supervisor asking a newly-returned service member whether he had got "all of his killing done"). On the record before this court, taken as a whole, no rational trier of fact could conclude that Mr. Porter's military status was a motivating or substantial factor in denying him promotions above the rank of captain. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation omitted). TSH is entitled to summary judgment on Mr. Porter's discrimination and retaliation claims challenging the decisions not to promote him throughout his years of employment with the company.

### B.    Evidence of Legitimate Independent Reasons for Non-Promotion

Even if the court were to assume that Mr. Porter had carried his initial burden of showing that his military status was a substantial or motivating factor in TSA's decisions not to promote him—an assumption which, to be clear, is not supported by the record evidence—summary judgment in TSH's favor would still be warranted. TSH has established legitimate independent reasons for declining to select Mr. Porter for promotions, and Mr. Porter has failed to present evidence creating a genuine dispute about those reasons.

Consistent with Mr. Hayes's perception of Mr. Porter as a person of uneven

temperament, TSH has presented evidence indicating that Mr. Porter was not promoted beyond the rank of captain because he lacked the necessary leadership skills to assume a higher-level role. Undisputed Facts ¶¶ 23-24. TSH has explained that Mr. Porter was viewed by management as "antagonistic," prone to negative talk about TSA and its management, given to routine complaining, and thus a person who "posed a threat to employee morale." Zehnder Decl. ¶ 14 (describing these attributes of Mr. Porter and stating that, "[a]s a result, Plaintiff did not embody the values TSA looked for in its leadership").

As counter to this evidence from TSH, Mr. Porter makes but one statement. He asserts that "Randy Zehnder's and Trans States' Airlines comments about my fitness for promotion, my leadership skills, and other derogatory comments are a pretext to Trans States Airlines' intentional discrimination, retaliation, and refusal to promote me because I missed work to perform military service." Porter Decl. ¶ 24. Mr. Porter's subjective proclamation—unsupported, as delineated above, by any nonconclusory, non-speculative evidence demonstrating an anti-military mindset by TSH—is insufficient to deny summary judgment.

"A challenge of pretext . . . requires a court to look at the facts as they appear to the person making the [employment] decision . . ., not the aggrieved employee." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007). Importantly, "[t]he relevant inquiry" for the court "is not whether the[] proffered reasons were wise, fair or correct, but . . . whether [the employer] believed those reasons to be true and acted in good faith upon those beliefs." *Id.* at 1200 (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)) (other quotation omitted)). "Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision." *Id.* (citing *EEOC v. Flasher Co.,* 986 F.2d 1312, 1322 n.12 (10th Cir. 1992)). And

"[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988)).

The trouble for Mr. Porter is that "mere conjecture" is all that he has placed in the summary judgment record. He has failed to put forward competent evidence to support his speculative contention that TSH's proffered reasons were a pretext for discriminating against him for having taken military leave. His mere surmise that his "miss[ing] work to perform military service" drove his non-selection for promotions, Porter Decl. ¶ 24, will not do. Thus, the court cannot find that Mr. Porter has presented facts from which a reasonable jury could conclude that the decisions not to promote him were so meritless as to call into question TSH's actual motivation. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (finding no evidence "of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons") (citation omitted). Because Mr. Porter has failed to adduce sufficient evidence to establish that TSH's reasons for not promoting him were a pretext for discrimination or retaliation prompted by anti-military animus, TSH is entitled to summary judgment on his discrimination and retaliation claims for this additional reason. *See Harp v. Dep't of Hum. Servs., Colo. Mental Health Inst. at Pueblo*, 932 F. Supp. 2d 1217, 1228 (D. Colo. 2013) (dismissing discrimination claim on summary judgment where plaintiff failed to

show pretext); *see also Ruiz v. Woodward, Inc.*, No. 17-cv-03046-MSK-KLM, 2019 WL 6893039, at *11 (D. Colo. Dec. 18, 2019) (same for retaliation claim).

### III.    Contributions to Mr. Porter's 401(k) Plan (Claim Two)

#### A.    Preliminary Considerations

Two initial matters must be addressed before the court proceeds to the substance of the claim and the summary judgment record.

The court begins by stating that it does not countenance Mr. Porter's apparent assumption that, in pursuing his pension claim against TSP, he is acting on behalf of a class of TSA pilots. *See* Resp. at 1 (asserting that TSP admits that it violated the rights of hundreds of pilots "by refusing to contribute to the pensions of servicemember pilots when they returned from active duty); *id.* at 2 (noting that TSP allegedly failed to make pension "contributions to the 'hundreds' of other similarly situated military pilots"); *id.* at 14 (arguing that TSP "refused to make the required pension contributions, and discriminated and retaliated against these servicemembers").

The court notes that Mr. Porter made reference to class claims in the operative complaint. *See* Am. Compl. at 15 (under "Prayer for Relief," requesting leave to amend "to include class claims under Fed. R. Civ. P. 23 if discovery proves numerocity [sic] and commonality of claims"). But Mr. Porter never properly acted on his proposal to amend in the manner required by the Federal Rules of Civil Procedure. He did not file a formal motion to amend seeking to add such claims or to certify a class, and this court declines to permit him to amend his complaint in the context of a response to a motion for summary judgment. *See, e.g.*, *Kurowski v. Slate*, No. 1:22-cv-00079-MIS-LF, 2023 WL 5672606, at *3 (D.N.M. Sept. 1, 2023), *report and recommendation adopted*, 2023 WL 6443843 (D.N.M. Oct. 3, 2023) (recognizing that a plaintiff

"cannot amend his complaint in a response to a motion for summary judgment"); s*ee also* Fed. R. Civ. P. 15 (not permitting amendments in this manner). This court therefore will not be diverted by the unsupported specter of a large group of former TSA pilots allegedly having similar complaints to make against TSH.[12] Instead, the court keeps its focus on the claim Mr. Porter has actually raised.

Next, the court does not find that Mr. Porter's pension claim is moot, as TSH urges. Motion at 19-20. To be sure, the undisputed evidence shows that TSH paid Mr. Porter more than two thousand five hundred dollars "to make up for the missed contributions during Plaintiff's periods of military leave[.]" Undisputed Fact ¶ 34. However, Mr. Porter has presented evidence in support of his belief that he is entitled to about four hundred dollars more than that, Additional Fact ¶ 3.2, and so there is "some relief" which this court potentially might award on the pension claim. Under these circumstances, TSH has not met its heavy burden to demonstrate mootness. *Rezaq v. Nalley*, 677 F.3d 1001, 1008, 1010 (10th Cir. 2012) (finding that "a case is not moot when there is *some* possible remedy, even a partial remedy or one not requested by the plaintiff") (citing *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992)) (emphasis in original). The court therefore proceeds to conduct a substantive analysis of the summary judgment record as it relates to Claim Two.

---

[12] While not obliged to exhaustively research claims that have not been brought by Mr. Porter, this court located no reference to another case in the Westlaw database raising a USERRA claim about pension contributions against TSA or TSH.

**B.        No Legal Entitlement to Contributions from TSA**

To recap the factual context in which Mr. Porter's pension claim arises, the undisputed record evidence shows that Mr. Porter last returned from military service sometime in late 2010 or early 2011, after his tenure at the Pentagon, *see* Undisputed Facts ¶ 27, and that **seven years** passed before he informed TSA, by means of a letter from his then-counsel, demanding that TSA make up contributions to his 401(k) plan for the long-past periods of active military duty. Undisputed Fact ¶ 33 (referencing October 15, 2018 letter from attorney Romer-Friedman). As the undisputed facts show, TSA's 401(k) retirement plan was a contributory plan, which required the employee to make a contribution in order to receive a match from TSA. Supplemental Trowbridge Decl., ECF No. 56-1 ¶ 3. Mr. Porter has brought forward no evidence showing that he requested to make up his missed contributions upon his return from military leave, or that he ever actually paid the plan any missed contributions.

Under Section 4318 of USERRA, a person reemployed after military leave is entitled to accrued benefits—including benefits like those at issue here, which are "contingent on the making of, or derived from, employee contributions"—but "only when certain conditions are met, including the condition that the employee pay make-up contributions within five years." *See Krzyminski v. Spokane Cnty.*, 830 F. App'x 918, 918-19 (9th Cir. 2020) (citing 38 U.S.C. § 4318(b)(2); 20 C.F.R. § 1002.262(c)).[13] Specifically, the statute provides:

> A person reemployed under this chapter shall be entitled to accrued benefits pursuant to subsection (a) that are contingent on the making of, or derived from, employee contributions or elective deferrals (as defined in section 402(g)(3) of the Internal Revenue Code of 1986) **only to the extent the person makes payment to**

---

[13] Thomas Jarrad, one of Mr. Porter's attorneys here, was also counsel to the plaintiff in *Krzyminski. See* 830 F. App'x at 918.

> **the plan with respect to such contributions or deferrals**. No such payment may exceed the amount the person would have been permitted or required to contribute had the person remained continuously employed by the employer throughout the period of service described in subsection (a)(2)(B). Any payment to the plan described in this paragraph shall be made during the period beginning with the date of reemployment and whose duration is three times the period of the person's service in the uniformed services, **such payment period not to exceed five years**.

38 U.S.C. § 4318(b)(2) (emphasis added). Further, per the accompanying regulations:

> If the employee is enrolled in a contributory plan he or she is allowed (but not required) to make up his or her missed contributions or elective deferrals. These makeup contributions or elective deferrals must be made during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of uniformed service, **with the repayment period not to exceed five years. Makeup contributions or elective deferrals may only be made during this period and while the employee is employed with the post-service employer**.

> If the employee's plan is contributory and he or she does not make up his or her contributions or elective deferrals, he or she will not receive the employer match or the accrued benefit attributable to his or her contribution because **the employer is required to make contributions that are contingent on or attributable to the employee's contributions or elective deferrals only to the extent that the employee makes up his or her payments to the plan**. Any employer contributions that are contingent on or attributable to the employee's make-up contributions or elective deferrals must be made according to the plan's requirements for employer matching contributions.

20 C.F.R. §§ 1002.262(b), (c) (emphasis added).

Applying these standards to the instant record, which lacks any evidence showing that Mr. Porter paid the obligatory make-up contributions to the plan within five years, TSA was under no legal obligation to provide an employer match. *See Krzyminski*, 830 F. App'x at 919 (affirming dismissal, on a motion to dismiss pursuant to Rule 12(b)(6), of a USERRA claim

challenging loss of pension service credit, where the plaintiff failed to allege that he paid the required make-up contributions within five years: "Because the pension service credit is contingent on the make-up payments, which Krzyminski did not pay, the County had no obligation to provide the credit."). Mr. Porter has failed to raise a genuine dispute about that point. As a matter of law, then, TSA is entitled to summary judgment on Mr. Porter's USERRA pension claim.

Notably, while TSA had no legal obligation to make match or "catch up" contributions to Mr. Porter's 401(k) plan, *see* 38 U.S.C. § 4318(b)(2); 20 C.F.R. § 1002.262(c), the evidence in the record shows that it nevertheless took it upon itself to do so. *See* ECF No. 42-15 at 1. That voluntary act[14] further emphasizes Mr. Porter's failure to bring forward evidence indicating that TSA's dealings with him were animated by an anti-military animus. On this record, no rational trier of fact could conclude otherwise.[15]

*    *    *

Based on the foregoing, the court finds that Mr. Porter has not adduced any evidence remotely suggesting that his military status was a motivating or substantial factor in TSA's decisions concerning his promotions, nor has he demonstrated any material fact issue to support

---

[14] Mr. Trowbridge's testimony, provided in his individual capacity because it was outside the scope of the topics noticed pursuant to Rule 30(b)(6), suggested that he may believe that TSA erred with regard to its contributions to Mr. Porter's pension plan. *See* Trowbridge Depo. at 112:5-10, 22-113:9, 17-19. If so, that belief is at odds with the statute and does not bind the court's analysis.

[15] To the extent Mr. Porter may intend to suggest that TSA was obliged to notify him about his obligation to make up his missed contributions to the 401(k) plan, that does not alter the court's conclusion that summary judgment should enter for TSA. There is no requirement to provide notice of the make-up payment requirement for contributory plans. *See* 20 C.F.R. § 1002.262(c).

his claim based on TSH's alleged failure to contribute to his 401(k) retirement plan.

Accordingly, TSA is entitled to summary judgment on all claims in this matter. In light of this

conclusion, the court does not address TSH's argument that Mr. Porter's claims are barred by the

doctrine of laches. *See* Motion at 7-11.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 42, is

**GRANTED**. The Clerk's office shall enter judgment in favor of TSH on all claims in this action

and shall close the case.

Plaintiff's Motion to Strike Sham Affidavit, ECF No. 57, is **DENIED**.

The parties' respective motions in limine, ECF Nos. 65, 66, are **DENIED as moot**.

Defendant's Motion for Leave to File a Surreply in Opposition to Plaintiff's motion to

Strike Sham Affidavit, ECF No. 62, is **TERMINATED** as **WITHDRAWN** by Defendant on

October 9, 2024, as reflected in its Notice of Withdrawal, ECF No. 64.

DATED: November 7, 2024                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge